UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADRIENNE BUSH,

      Plaintiff,

v.

LUMILEDS, LLC, a/k/a PHILIPS
AUTOMOTIVE LIGHTING,

      Defendant.

Case No. 2:16-cv-11761
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

---

**OPINION AND ORDER**
**ADOPTING IN PART REPORT AND RECOMMENDATION [89] AND**
**GRANTING IN PART MOTION FOR SUMMARY JUDGMENT [69]**

---

Plaintiff Adrienne Bush worked for Defendant Lumileds, LLC (formerly Philips Automotive Lighting) for a number of years. She believes that, during her employment, her job duties were taken away, she was paid less for her work, she was deprived of benefits, and, ultimately, she was terminated in part because she is African American. And Bush believes that after she complained of discrimination to Lumileds' human-resources department and to the Equal Employment Opportunity Commission, Lumileds retaliated. Bush has thus sued Lumileds under Title VII of the Civil Rights Act of 1964 (as amended) and Michigan's Elliott-Larsen Civil Rights Act.

Lumileds seeks summary judgment. From the company's perspective, discovery has not uncovered evidence permitting a reasonable jury to find that its actions were motivated by race or were taken because Bush complained of discrimination. Magistrate Judge Elizabeth A. Stafford, in a thorough and well-reasoned report, recommends granting Lumileds summary judgment. Bush, proceeding pro se, objects to that recommendation in whole. Having examined

all of Bush's claims anew, the Court finds that Lumileds is entitled to summary judgment on all but Bush's discriminatory discharge claims.

## I.

## A.

The Court starts with a basic timeline of Bush's tenure at Lumileds; the details will be presented in the course of analyzing Bush's claims. As Lumileds has moved for summary judgment, the record is viewed in the light most favorable to Bush. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Bush started working at Lumileds' office in Farmington Hills, Michigan in 2010. (R. 79-2, PageID.2439.) At that time, Bush was not a direct employee of Lumileds but had been placed at Lumileds through a third-party agency. (R. 79-2, PageID.2439.)

That changed in March 2013, when Lumileds hired both Bush and Marjorie Marion. (R. 69-2, PageID.1301.) Although Lumileds' organizational charts state that both Bush and Marion were "Office Admin" (R. 69-36, PageID.1699), Bush testified that they were both "Sales Administrators" (R. 69-2, PageID.1164, 1301). Either way, both Bush and Marion reported directly to Rhonda McKee-Hessel, the Customer Service and Office Administration Supervisor. (R. 69-36, PageID.1699; R. 69-26, PageID.1633.) McKee-Hessel's supervisor was Thomas Stolzenfeld, the head of "Operations." (R. 69-36, PageID.1699.)

In November 2013, Lumileds hired Anna Arends. Bush believes that Arends was hired because she could not find a job in the United States and was the spouse of a Lumileds' director. (R. 69-2, PageID.1175.) Bush says Arends was given her duties but paid more. (R. 69-2, PageID.1172, 1166–1167, 1196.) Arends is Caucasian.

In December 2013, Bush contacted Alyssa Gorski in human resources to report that Arends' hiring was discriminatory. (R. 69-6, PageID.1355–1356.) Although Gorski's summary of Bush's complaint and of the subsequent investigation nowhere mentions race (or any other type of discrimination prohibited by law), Bush testified that Gorski's summary was inaccurate. (R. 69-2, PageID.1185–1191.) According to Bush, she complained of a number of racially discriminatory practices at Lumileds. (R. 69-2, PageID.1176, 1187–1191; R. 79-2, PageID.2444.)

In January 2014, Bush received a negative performance review. The review was primarily prepared by McKee-Hessel but Bush's rating was finalized in a calibration meeting with Stolzenfeld and other managers. (*See* R. 79-1, PageID.2404; R. 69-25, PageID.1561–1562; R. 69-26, PageID.1635; R. 69-33, PageID.1684.) In terms of "what" Bush accomplished, she received a "Solid results," which is a positive rating. (R. 69-8, PageID.1364.) But in terms of "how" Bush accomplished it, she received an "improvement required" rating. (R. 69-8, PageID.1364.) Bush's "improvement required" rating made her ineligible for an annual pay-raise in March 2014. (R. 69-37, PageID.1716.) Bush believes that her negative rating was retaliation for complaining about discrimination to Gorski the month before. (R. 30, PageID.385–386.)

In July 2014, Stolzenfeld or McKee-Hessel (or both) assigned Bush some of McKee-Hessel's duties. (R. 79-2, PageID.2445.) When Bush asked for a pay raise for the additional (and higher-level) work, Stolzenfeld said "no." (R. 69-2, PageID.1226; R. 79-2, PageID.2445.) And when Bush asked if the additional duties could be split between her and Marion, Stolzenfeld said "they were not for [Marion]." (R. 79-2, PageID.2445.) Bush complained to Gorski that the assignment of the additional duties was discriminatory. (R. 69-2, PageID.1225.)

In January 2015, Bush requested to use Lumileds' flextime policy so that she could take a class on Tuesday mornings. (R. 79-2, PageID.2446.) Stolzenfeld denied the request without explanation, forcing Bush to use vacation days to take the course. (R. 69-2, PageID.1232; R. 79-2, PageID.2446.) Bush maintains that three Caucasian employees were allowed to use flextime. (R. 79-2, PageID.2446, R. 69-2, PageID.1233–1235.)

Also in (or around) January 2015, Bush received her review for the 2014 year. Her rating was better than the one from the prior year: "Solid results" on the "what" axis and "Valued player" on the "how" axis. (R. 69, PageID.1208.)

But it appears that Bush received a negative performance review in July 2015. In early August 2015, Bush was approved for tuition reimbursement but after challenging her July review, the reimbursement was rescinded. (R. 69-13, PageID.1386; R. 69-14, PageID.1389–1393.) Bush believes that Lumileds took back the tuition reimbursement in retaliation for challenging her review.

Bush says that in September 2015, "my position was posted on Monster.com." (R. 79-2 PageID.2447; *see also* R. 69-2, PageID.1284.) When Bush inquired into the job posting, she was told she could apply for the position. (*See* R. 69-21, PageID.1417.) But one of the job qualifications was a bachelor's degree. (R. 69-2, PageID.1287.) As Bush was still in the process of completing her degree, she did not apply. (*See* R. 69-2, PageID.1287.)

On September 8, 2015, Bush filed her first Equal Employment Opportunity Commission charge. She asserted in part, "On August 18, 2015 I wrote a letter to human resources of my disapproval of [my performance] review. By September 1, 2015, my tuition approval was rescinded . . . . Due to being one of the very few African American employees there I know I am held to different standards than the Caucasian employees. I believe I was denied my tuition in

retaliation of going to a protected activity due to my race (African American) in violation of Title VII of the Civil Rights Act of 1964, as amended." (R. 69-18, PageID.1411.)

In October 2015, Lumileds filled the position that had been posted on Monster.com and hired Katie Wougamon as a "Sales Administrator." (*See* R. 69-22, PageID.1419.) Wougamon is Caucasian.

Later in October, Lumileds placed Bush on a performance improvement plan. (R. 79-2, PageID.2447.)

In November 2015, Bush filed a second charge with the EEOC. (R. 69-19, PageID.1413.) Bush told the EEOC that she believed her performance improvement plan was retaliation for filing the September EEOC charge. (R. 69-19, PageID.1413.)

In December 2015, Bush either filed an amendment to her first charge or a third EEOC charge. (R. 69-20, PageID.1415.) Either way, Bush complained that after she challenged her July 2015 performance review, her job had been posted and her tuition reimbursement rescinded. (R. 69-20, PageID.1415.) Bush also complained that Lumileds forced her to use vacation time instead of flextime. (R. 69-20, PageID.1415.) She wrote, "Due to being one of the very few African American employees there I know I am held to different standards than the Caucasian employees." (R. 69-20, PageID.1415.)

On January 29, 2016, Bush received a notice pursuant to the Worker Adjustment and Retraining Notification Act. (R. 69-17, PageID.1408; R. 79-2, PageID.2448.) The notice informed Bush that Lumileds was undergoing restructuring and that her last in-office day would be January 29 and that her last official day would be March 31, 2016. (R. 69-17, PageID.1408.) Bush asserts that neither Marion nor Wougamon were selected in the reduction in force despite that they both did her same job and were paid more. (R. 30, PageID.400.)

**B.**

Bush filed this lawsuit in May 2016.

The next month, Lumileds (and McKee-Hessel and Stolzenfeld) moved to dismiss the case. (R. 13.) The Court referred that motion, and all pretrial matters, to Magistrate Judge Elizabeth A. Stafford. Magistrate Judge Stafford recommended dismissal. (R. 25.) While this Court agreed that Bush's complaint and proposed amended complaint were deficient in several respects, the Court gave Bush the opportunity to file a "final" amended complaint. *See Bush v. Lumileds, LLC*, No. 16-11761, 2017 WL 1173774, at *10 (E.D. Mich. Mar. 30, 2017).

Bush did so. Although her final complaint contains seven counts, there are more claims than seven. (*See* R. 30.) And while it appeared that Bush's original complaint and proposed amended complaint were based on Title VII only, each count of her final complaint asserts claims under both Title VII and Michigan's Elliott-Larsen Civil Rights Act. (*See* R. 30.)

Lumileds has moved for summary judgment on Bush's entire final complaint. (R. 69.) And for the reasons stated in a thorough, 47-page report, the Magistrate Judge recommends granting Lumileds' motion. (*See* R. 89.)

Bush has filed 14 objections to the Magistrate Judge's report. (R. 94.) And Lumileds has filed three. (R. 93.)

**II.**

"A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).  Here, Bush has filed at least one objection relating to each of the counts in her complaint. (R. 94.) And Bush is proceeding pro se. Thus, while the

Magistrate Judge provided a comprehensive report, this Court will decide anew if Lumileds is entitled to summary judgment on each of Bush's claims.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The Court addresses Bush's Title VII discrimination claims and then her retaliation claims. But before addressing either, it discusses a threshold issue.

## A.

In examining Bush's three EEOC charges, the Court previously found that Bush's "claims of discrimination or retaliation under Title VII based on . . . pre-2015 events[] and her termination [were] unexhausted." *See Bush*, 2017 WL 1173774, at *5. But the Court allowed Bush to "set forth additional facts" in her final complaint indicating that claims beyond those set out in her charges were exhausted. *Id.*

In seeking summary judgment, Lumileds argued that "Bush's claims regarding pre-2015 conduct and her termination fail as a matter of law because Bush failed to exhaust her administrative remedies." (R. 69, PageID.1124.)

The Magistrate Judge largely agreed with Lumileds' exhaustion argument. Referring to this Court's prior ruling, the Magistrate Judge explained, "Bush's [final] complaint fails to set forth sufficient facts to demonstrate that she exhausted any claims beyond those set forth in her EEOC charges." (R. 89, PageID.3010.) And based on statements in Bush's summary-judgment response and in her final complaint, the Magistrate Judge concluded that there was "no dispute that the pre-2015 and termination claims were not exhausted during the EEOC proceedings."

(R. 89, PageID.3010.) But because Bush had brought each of her claims under both Title VII and the Elliott-Larsen Civil Rights Act, and because ELCRA has no exhaustion requirement, the Magistrate Judge proceeded to address the merits of all of Bush's claims. (*See* R. 89, PageID.3013.)

As will be explained, with exception for one Title VII claim, the Court finds that Bush's Title VII claims fail on the merits. As for the one exception, the Court finds that any failure to exhaust that claim should be excused. As such, the Court need not decide whether every reasonable jury would find that Bush did not exhaust claims based on pre-2015 events or her termination. *See Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) (finding that vast majority of circuits treat non-exhaustion as an affirmative defense).

**B.**

The Court thus turns to Bush's claims of discrimination; the Court proceeds through them chronologically.

Before doing so, the Court notes two allegedly discriminatory acts that cannot be placed at a particular point on the timeline. Bush claims that sometime during her employment, Stolzenfeld called her a "bulldog." (R. 69-2, PageID.1294.) Bush testified that this was discrimination because "I'm a human being, I'm not an animal." (R. 69-2, PageID.1294.) Bush also asserts that during her time at Lumileds, "the white males was paid more than the white females and the white females were paid more than the African-American females." (R. 69-2, PageID.1307.) The Court will keep these two allegations in mind as it proceeds through the specific, discriminatory acts Bush has alleged in this suit.

When there is no direct evidence of discrimination and the plaintiff's theory is that race alone was sufficient to motivate the employer's adverse actions, *McDonnell Douglas* applies. *See*

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 n.10 (6th Cir. 2008) (providing that *McDonnell Douglas* continues to govern single-motive claims); *Haydar v. Amazon Corp., LLC*, No. 2:16-CV-13662, 2018 WL 4282777, at *20 (E.D. Mich. Sept. 7, 2018). Under that burden-shifting framework, Bush has the initial task of establishing a *prima facie* case of discrimination under Title VII. To do so, Bush must show that (1) she was a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for her position, and (4) she was "replaced by someone outside the protected class" or "treated differently than similarly-situated, non-protected employees." *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018). If Bush establishes a *prima facie* case of discrimination, the burden of production shifts to Lumileds to evidence "some legitimate, nondiscriminatory reason" for the adverse employment action. *See id.* (internal quotation marks omitted). If Lumileds does so, then Bush must show that Lumileds' reason was pretext for discrimination. *See id.*

### 1.

In Count I, Bush alleges that three discriminatory acts occurred in 2012. First, Bush was offered a customer-service position through a staffing agency that was not offered to Marion (recall Marion is Caucasian and held Bush's same job). (R. 79-2, PageID.2440; R. 69-25, PageID.1533.) Second, McKee-Hessel contacted Bush's staffing agency and advised that Bush's assignment would be ending. (*See* R. 94, PageID.3354.) While it appears that this was because Bush's term was scheduled to end in August 2012 (R. 69-23, PageID.1442–1443), Bush avers that her placement was "open-ended" (R. 79-2, PageID.2439). Third, Bush asserts that in October 2012, McKee-Hessel refused to give her a pay raise, even though she gave a pay raise to Marion. (R. 79-2, PageID.2441; R. 94, PageID.3354.)

The Magistrate Judge found that Bush had not shown that Lumileds took an adverse action against her in 2012. (*See* R. 89, PageID.3018–3019.)

In her objections, Bush does not point out a specific flaw in the Magistrate Judge's analysis of Count I. Instead, Bush appears to just restate the alleged discriminatory acts, perhaps in slightly greater detail. (R. 94, PageID.3353–3354.)

In any event, having examined Count I, Bush's summary-judgment brief, and Bush's objections, the Court's independent analysis leads it to the same place as the Magistrate Judge. Under Title VII, an adverse employment action results in a material "change in the terms or conditions of employment." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). The mere act of offering Bush a job did not affect the terms or conditions of Bush's employment. Nor did McKee-Hessel's act of contacting people about Bush leaving—Bush ended up keeping her same position. In particular, other managers met with the General Manager of the Farmington Hills office, Dennis Samfilippo, to keep Bush on. (*See* R. 79-2, PageID.2441.) True, Bush's duties may have changed such that she spent only 5% of her time on operations work and the remainder on sales and marketing work. But Bush preferred sales and marketing over operations (*see* R. 79-2, PageID.2442–2243, 2244) and has not produced evidence that a reasonable employee would have viewed sales and marketing work as much worse than operations work, *cf. Crane v. Mary Free Bed Rehab. Hosp.*, No. 1:13-CV-1294, 2015 WL 10791897, at *6 (W.D. Mich. Mar. 13, 2015). As for disparate pay, while McKee-Hessel may have provided Bush's placement agency with information that affected Bush's pay (e.g., information about Bush's duties and performance), McKee-Hessel testified that while Bush was staffed by the agency, she was not "involved in setting Bush's pay." (R. 69-26, PageID.1634.) In

any event, it appears that after Bush raised the pay issue with Samfilippo, she received the same pay as Marion. (*See* R. 79-2, PageID.2441; R. 69-25, PageID.1539–1540; R. 30, PageID.380.)

As Bush has not established that Lumileds took an adverse action against her in 2012, Lumileds is entitled to summary judgment on Bush's Title VII claim in Count I.

**2.**

Count II centers on the hiring of Anna Arends in November 2013. In Bush's view, this was problematic in multiple ways. Bush asserts that Arends was married to Lumileds' Director of Finance, that she needed a visa to even work at Lumileds, and that Arends' prior work experience was as a nanny. (R. 69-2, PageID.1170, 1175.) Bush asserts that Lumileds took the "exact" sales and marketing duties that she had been performing and gave them to Arends—and paid Arends more. (R. 79-2, PageID.2442; R. 94, PageID.3355; R. 69-23, PageID.1457.) And, at the time, "95%" of Bush's work was sales and marketing. (R. 79-2, PageID.2442.) As noted, Arends is Caucasian.

Although unclear, it appears that Bush's allegations about Arends might amount to two discrimination claims: (1) Lumileds took desirable job duties from one employee and gave them to another employee because of race and (2) Lumileds paid an African-American employee less than a Caucasian employee for doing the same work.

As for the second claim, the Court agrees with the Magistrate Judge that it fails at least because Bush and Arends were not similarly situated in all "relevant respects." *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *see also Debra v. JPMorgan Chase & Co.*, No. 17-1411, 2018 WL 4212493, at *6 (6th Cir. Sept. 5, 2018). Start with work experience. The announcement of Arends' hire states, "[Arends] joins us with previous Philips Consumer Lifestyle experience, proven entrepreneurial expertise, marketing, online-content

management and project management skills." (R. 69-4, PageID.1350.) Bush does not allege she had similar experience. As for education, Arends had a bachelor's degree in business administration (R. 69-4, PageID.1350); Bush did not have a bachelor's degree (*see* R. 69-2, PageID.1251).

Bush's and Arends' job titles, supervisors, and job duties were different too. Bush was a Sales Administrator (or an Office Administrator) and reported to McKee-Hessel, the Customer Service and Office Administrator Supervisor. (*Compare* R. 69-2, PageID.1164, *with* R. 69-36, PageID.1700, R. 69-26, PageID.1633.) McKee-Hessel and Bush were under Stolzenfeld, the head of Operations. (R. 69-36, PageID.1701.) In contrast, Arends was hired as a Marketing Analyst and reported to Ann-Marie Hines, a Senior Marketing Manager. (R. 69-4, PageID.1350.) Neither Arends nor Hines were under Stolzenfeld. (R. 69-36, PageID.1701.) And while maintaining that the very duties listed in Arends' new-hire announcement had been hers (R. 69-2, PageID.1172), Bush conceded that Arends eventually did other work (R. 69-2, PageID.1174). Stolzenfeld went a step further, saying that Arends performed "[s]ignificantly different" duties. (R. 69-25, PageID.1627; *see also* R. 69-26, PageID.1635.)

In short, because a host of differences that bear on salary existed, the mere fact that Bush and Arends were of different races does not give rise to an inference that Arends was paid more because she was Caucasian. In other words, under *McDonnell Douglas*, Bush's disparate pay claim fails because Bush and Arends are not "similarly situated." *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (implying that if a plaintiff cannot establish a *prima facie* case of discrimination, she has not eliminated "the most common nondiscriminatory reasons" for the employer's action).

That leaves Bush's claim that Lumileds took job duties from her and gave them to Arends on account of race. But Bush's own argument is in tension with this claim. If, as Bush suggests, Lumileds hired Arends because she was the spouse of a Lumileds director who needed employment to secure a visa, then Lumileds would have had to find work for Arends to do. Bush's duties may have been the most amenable to transfer. Also, as discussed, Arends had different work experience and education than did Bush and held a position in the marketing group. Those are nondiscriminatory reasons for Lumileds to have transferred duties from Bush to Arends.

In short, a *de novo* review leads the Court to the conclusion that the Magistrate Judge reached: Lumileds is entitled to summary judgment on Bush's Title VII claim in Count II.

### 3.

Count III moves ahead on the timeline to the period spanning December 2013 through March 2014.

Although Bush may have only intended to assert unlawful retaliation in Count III, the count includes allegations suggesting a claim of unlawful discrimination. In particular, Bush says that in March 2014, she was denied an annual bonus and a base-pay increase. (R. 30, PageID.385; *see also* R. 79-2, PageID.2444.) But, Bush avers, "Ma[r]jorie Marion received a bonus." (R. 79-2, PageID.2444; *see also* R. 30, PageID.385.) And recall that Marion and Bush became permanent Lumileds employees at the same time, held the same job title, and reported to McKee-Hessel. Bush also testified that everyone in the sales group and operations group received a bonus—except her. (R. 69-2, PageID.1216.) So the Court will treat Count III as raising a discrimination claim.

The Court does not believe that a reasonable jury could find that Bush's race even partly motivated Lumileds' decision not to pay her a bonus or increase her base pay in March 2014.

Start with Bush's claim that everyone in the sales group received a bonus. Bush testified that she learned of her exclusion through "open discussions." (R. 69-2, PageID.1216.) But in contrast to vague "open discussions," documentary evidence indicates that no one received the bonus set out in Bush's offer letter. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Bush's offer letter indicates that she was eligible for something called the "Performance Sharing Plan." (R. 69-3, PageID.1347.) The letter goes on to explain that, under the plan, Bush would be entitled to "1.25% to 5% of eligible earnings"—if Lumileds hit its goals for the year. (R. 69-3, PageID.1347.) Indeed, Lumileds avers that under the PSP, bonuses were paid out "only if" the Lighting Sector achieved business goals. (R. 70, PageID.1799 (discovery response); *see also* R. 69-30, PageID.1664–1665.) And the undisputed evidence shows that "the Lighting Sector did not hit its target goals" so "no members of the sales team received a PSP incentive bonus." (R. 70, PageID.1799; *see also* R. 69-23, PageID.1477; R. 69-30, PageID.1664–1665.) So, at least as far as the PSP goes, Bush was not singled out.

As for Bush's claim that everyone in operations but her received a bonus, the Court notes that Bush's offer letter only explicitly mentions the PSP. (R. 69-3, PageID.1347.) So it is not clear what other bonus Bush was even eligible for. Moreover, Bush has not explained the criteria used for awarding the operations bonus let alone that she was similarly situated to all other operations personnel with respect to those criteria. (The Court specifically addresses Marion below.)

Bush also testified to something called a "discretionary" bonus which she received in 2015 but not 2014. (R. 69-2, PageID.1213–1214.) Bush explained that when the discretionary

bonus was awarded in 2015, "we made our numbers," but, because the "percentage was low," Lumileds provided "a discretionary bonus for that amount of money." (R. 69-2, PageID.1214.) But Bush has not shown that the same circumstances existed in 2014. So Lumileds' payment of a discretionary bonus in 2015 but not 2014 does not suggest discrimination.

That leaves Bush's averment that Marion got a "bonus" in 2014 but she did not. (*See* R. 79-2, PageID.2444; R. 30, PageID.385.) Although initially stating that Marion received a bonus, Lumileds corrected its discovery responses to explain that Marion received a base-pay increase in March 2014. (R. 70, PageID.1799; R. 69-23, PageID.1477–1478; R. 69-30, PageID.1665.) And while Bush did not receive a base-pay increase, the record provides a nondiscriminatory reason for the disparate treatment. In particular, Bush was not eligible to receive a base-pay increase in March 2014 because her rating was a "solid results" (on "what") and an "improvement required" (on "how"). (*See* R. 69-37, PageID.1716; R. 69-2, PageID.1219.) And because Bush has no evidence that Marion had a similarly low rating, it would appear to readily follow that Bush cannot show that she and Marion were similarly situated in all respects relevant to pay.

But Bush claims that her own rating was too low. In particular, Bush says that McKee-Hessel's assessment of her was simply "person[a]l." (R. 79, PageID.2221.) Bush further asserts that she "provided documentation" that undermined McKee-Hessel's assessment. (R. 79, PageID.2221; R. 79-2, PageID.2444.) Bush even says that "other [m]anagers" (presumably those in sales and marketing for whom Bush also worked) "began questioning 'why' [she] received a poor performance review." (R. 79, PageID.2221.)

But even if McKee-Hessel's assessment of Bush was partly false, Bush points to nothing in the record indicating that her race motivated the partial falsity. To the contrary, Bush claims

that the rating was false because she had filed a whistleblower complaint the month before. (R. 79, PageID.2235.) But a false review because of a complaint about race discrimination is not the same as a false review because of race discrimination.

In sum, to the extent Bush has raised a Title VII discrimination claim in Count III, no reasonable jury could find that Lumileds' decision not to pay Bush a bonus or increase her pay in March 2014 was motivated by race.

**4.**

Count IV focuses on the fallout from duties that Stolzenfeld or McKee-Hessel assigned Bush beginning in July 2014 and throughout the following year. (R. 30, PageID.387–388; R. 69-2, PageID.1224.)

In July 2014, some of the duties that had been McKee-Hessel's were transferred to Bush. (R. 79-2, PageID.2445.) When Bush asked if the extra duties could be split with Marion, Stolzenfeld said the tasks were "not for her." (R. 79-2, PageID.2445.) And when Bush asked for more pay because she was doing some of McKee-Hessel's work (McKee-Hessel was at a higher pay grade than Bush), Stolzenfeld denied Bush's request without explanation. (R. 69-2, PageID.1226; R. 79-2, PageID.2445.)

These duties, along with other tasks that McKee-Hessel would assign Bush over the next year, forced Bush to work overtime. Apparently Bush had to work overtime because the tasks coming from McKee-Hessel were operations tasks (*see* R. 69-23, PageID.1480), but sales and marketing work were already occupying "95%" of Bush's time (*see* R. 69-2, PageID.1224; R. 79-1, PageID.2425).

Compounding it all, says Bush, is that she was not given pay for her overtime but instead provided with compensatory time. (According to the U.S. Department of Labor's website,

"[c]ompensatory time off (comp time) is paid time off the job that is earned and accrued by an employee instead of immediate cash payment for working overtime hours."). Bush asserts that the practice of providing compensatory time in lieu of overtime pay was also applied to African Americans in the customer-service group, a group that McKee-Hessel also supervised. (R. 30, PageID.388; R. 79, PageID.2229; R. 94, PageID.3559.)

On the record before the Court, no reasonable jury could find that the extra duties Bush received, the denial of increased pay for handling those duties, or the denial of overtime pay was motivated in part by her race.

Start with Bush's claim that, beginning in July 2014, she received extra duties that Marion did not. In a footnote, Lumileds asserts that the extra duties were not an adverse action. (R. 69, PageID.1131.) True, the case Lumileds cites does state that "a mere inconvenience or an alteration of job responsibilities is not sufficient to constitute an adverse employment action." *Leavey v. City of Detroit*, 467 F. App'x 420, 425 (6th Cir. 2012) (internal quotation marks omitted). But the Court does not understand this to mean that a change in job duties that trigger longer hours cannot amount to an adverse action. And here, Bush alleges that the extra duties caused her to work overtime (and that she did not receive overtime pay but only compensatory time). *See Broska v. Henderson*, 70 F. App'x 262, 267 (6th Cir. 2003) ("[J]ob changes that do not change one's salary, benefits, title, *or work hours* usually do not constitute adverse employment actions, even if one's job becomes significantly more difficult." (emphasis added)); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) ("We have held that assigning more, or more burdensome, work responsibilities, is an adverse employment action."); *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 819 (9th Cir. 2002) (indicating that "discriminatory overtime" work was an adverse action).

In any event, the Court agrees with the Magistrate Judge that Bush "does not provide any evidence of her duties as compared to Marion's." (R. 89, PageID.3035.) While Bush was given duties from McKee-Hessel's desk that were not given to Marion, Bush has not shown that Marion did not have other comparable duties or that Marion did not have to work a comparable amount of overtime. Bush only very generally states that her "workload was greater" than Marion's. (R. 79-2, PageID.2441.) As the Magistrate Judge stated, "[Bush's] personal belief that she received disproportionately more work than Marion is not enough for a jury to find that she was discriminated against." (R. 89, PageID.3035.)

The record also does not permit a reasonable inference that Bush was given compensatory time instead of overtime pay because of her race. In her summary-judgment brief, Bush asserts, "With the increased workload, the African-American [customer-service representatives] and the Plaintiff [were] advised that we [were] . . . only to receive comp. time." (R. 79, PageID.2229.) But the only evidence that Bush cites in support of this claim, McKee-Hessel's testimony, does not support it: "[Comp time instead of overtime pay] was the office['s] way of working. . . . They wanted you to manage your workload, so that your work was done mostly non-overtime, versus a lot of overtime, coming out of . . . payroll. Therefore, if you had overtime of a large amount, it needed to be approved by the supervisor." (R. 69-23, PageID.1482.) And in her complaint, Bush suggested that compensatory time was given to everyone in customer service, not just the African-American customer-service representatives: "[Comp time instead of overtime pay] is the same practice used on the Customer Service *team* that is *primarily* African-American females." (R. 30, PageID.388 (emphases added).)

While that largely addresses Bush's claim about discriminatory overtime pay, Bush also more generally asserts, "The African-American Customer Service members and the Plaintiff

were continuously provided heavy workloads when our Caucasian counterparts were provide[d] less duties and better pay." (R. 79, PageID.2229; *see also* R. 94, PageID.3359.) In support of this assertion, Bush offers the affidavit of Janice Combs, an African-American customer-service representative. Combs avers that while she was given the title of "Lead" customer-service representative and classified on the pay scale as "Level 3," she never received pay befitting that title. (R. 79-2, PageID.2452.) Combs also avers that Stephanie Clark, a Caucasian customer-service representative, was paid more than African-American CSRs despite being hired later. (R. 79-2, PageID.2456.) (Bush says that Clark's pay was even higher than Combs' pay (R. 94, PageID.3359), but Combs' affidavit is not so clear. And Lumileds was deprived of the ability to clarify the point because Combs was not disclosed on a witness list and her affidavit was not produced prior to Bush's summary-judgment response brief—well after discovery closed. (*See* R. 42, 74; R. 91, PageID.3152 n.6 (noting that Combs was not "disclose[d] until two months after the close of discovery").))

Even though McKee-Hessel supervised both Bush and the customer-service representatives, the Court does not believe that Combs' testimony would permit a jury to infer that Stolzenfeld or McKee-Hessel gave Bush more work and did not increase her pay on account of Bush's race. Combs does not explain why she was not paid commensurate with her title. And Combs does explain that Clark was a Level 2 CSR and suggests that the CSRs who were paid less were "still a Level 1." (R. 79-2, PageID.2456.) In other words, Combs' affidavit permits only a weak inference that there was race-based pay discrimination within the customer-service group and thus permits an even weaker inference that race was a reason that Bush—who was not a customer-service representative—was not given more pay or overtime pay.

In sum, Bush has not cited evidence permitting a reasonable jury to find that her extra duties, denial of a pay increase for those duties, or denial of overtime monetary pay were motivated in part by her race. To the extent Count IV alleges discrimination prohibited by Title VII, the Court agrees with the Magistrate Judge that Lumileds is entitled to summary judgment on Count IV. (*See* R. 89, PageID.3035.)

**5.**

Count V moves ahead to January 2015. (R. 30, PageID.390–391.)

That month, Bush was planning on taking a class toward her bachelor's degree. (R. 30, PageID.390; *see also* R. 79-2, PageID.2446.) As the class was Tuesday mornings, she wanted to exercise Lumileds' flextime benefit. (R. 69-2, PageID.1227, 1228–1230.) The managers in sales and marketing for whom Bush worked had no issue with Bush being out of the office on Tuesday mornings. (R. 69-2, PageID.1230; R. 94, PageID.3347.) Despite that, Stolzenfeld denied Bush the use of Lumileds' flextime benefit without explanation. (R. 79-2, PageID.2446; R. 94, PageID.3346.) Ultimately, Bush was required to use her vacation time to take the course. (R. 79-2, PageID.2446; R. 94, PageID.3346.)

The record at most permits the reasonable inference that Stolzenfeld unjustifiably denied Bush the use of flextime. But unjustifiably does not mean discriminatorily. Bush attempts to make the latter showing by identifying three Caucasian employees who were granted the use of flextime. (R. 69-2, PageID.1233–1234.) The Magistrate Judge ably explained that each of those three employees held different positions than did Bush. (R. 89, PageID.3036–3037.) And a fresh look reveals that the Magistrate Judge was correct: the three Caucasian employees were planners or forecasters and Stolzenfeld testified that those two jobs were amenable to work outside the office. (R. 69-33, PageID.1687.) In her objections, Bush makes no attempt to show that the three

Caucasian employees were similarly situated in all relevant respects, *Ercegovich*, 154 F.3d at 352; Bush instead repeats her assertion that Stolzenfeld gave her no explanation for denying flextime. (R. 94, PageID.3346.)

Having looked at Bush's Title VII discrimination claim in Count V anew, the Court agrees with the Magistrate Judge that Lumileds is entitled to summary judgment on that claim.

**6.**

Although the allegations in Count VI pertain primarily to unlawful retaliation, it appears that Bush also asserted (or intended to assert) that Lumileds discriminated by hiring Katie Wougamon and then paying Wougamon more to do Bush's work. (*See* R. 30, PageID.378, 394–395; R. 79, PageID.2233.)

To understand this claim, more backstory is helpful. Bush apparently received a less-than-great performance review in July 2015 and so, in August 2015, submitted a rebuttal to her review. Then, says Bush, "on September 3, 2015, my position was posted on Monster.com." (R. 79-2 PageID.2447; *see also* R. 69-2, PageID.1284.) By this, it is not clear whether Bush means her specific spot at Lumileds or just another Sales Administrator position. In either case, it appears that one of the job requirements was a bachelor's degree. Bush "emailed the Sales Manager Russ Stebbins regarding the position and was advised that [she] could apply if the qualifications were met, however Lumileds LLC was aware that [Bush] was currently completing the bachelors program." (R. 30, PageID.378.) On October 20, 2015, Lumileds announced the hire of Wougamon as a new "Sales Administrator." (R. 69-22, PageID.1419.) Bush points out that Wougamon is Caucasian and claims that Lumileds paid Wougamon $30,000 more per year for "the exact same duties that [Bush] had been performing for the past couple years." (R. 69-2, PageID.1292; *see also* R. 69-2, PageID.1284; R. 79, PageID.2233.)

This claim is similar to Bush's claim about Lumileds' hiring of Arends. In particular, it appears that Bush believes Lumileds discriminated by (1) giving her position to a Caucasian employee and (2) paying her less than a Caucasian employee for doing the same duties.

Apart from the fact that Bush's race differs from Wougamon's, Bush does not have evidence that Lumileds hired Wougamon instead of her or paid Wougamon more than her on account of their races. And, as the Magistrate Judge ably explained, "Bush and Wougamon were . . . not similarly situated in all relevant respects." (R. 89, PageID.3042.) *Education*: Bush has no evidence that Wougamon also lacked a bachelor's degree and, given that it was a job qualification, the reasonable inference is that Wougamon did. *Experience*: Wougamon had 15 years' experience in the "automotive aftermarket," including at Delphi where she was a "Senior Sales Administrator and Pricing Administrator" (R. 69-22, PageID.1419); Bush has not shown that her work experience was comparable. *Supervisors*: Wougamon's supervisor was Russ Stebbins, the Director of Sales, NAFTA Aftermarket (R. 69-22, PageID.1419); while Bush testified that Stebbins was also one of her supervisors (R. 69-2, PageID.1288), formally at least, Bush's supervisor was McKee-Hessel and Bush was under Operations (R. 69-36, PageID.1699, 1709). *Duties*: while Bush testified that the job posting listed her "exact" duties (R. 69-2, PageID.1284, 1292), Bush also testified that she did not know Wougamon's specific tasks upon hire (R. 69-2, PageID.1290); and Stolzenfeld testified that "Wougamon performed many duties for the Sales and Marketing teams which Bush had never performed. For example, Wougamon oversaw a project in which the Sales team devised a structured approach to identify sales targets and secure new business and customers" (R. 69-33, PageID.1688).

In short, to the extent that Bush claims that she instead of Wougamon should have been hired as Sales Administrator, she has not shown that she and Wougamon were "similarly

situated" in all relevant respects. And to the extent that Bush claims that Lumileds paid her less on account of her race, the differences in Bush's and Wougamon's education, experience, supervisors, and duties preclude a reasonable jury from inferring that disparate treatment was on account of race.

Thus, to the extent Count VI asserts a Title VII claim of discrimination based on Wougamon's hire, the Court agrees with the Magistrate Judge that Lumileds is entitled to summary judgment on that claim.

**7.**

Count VII of Bush's complaint centers on her termination. Before turning to the merits of Count VII, the Court must address two threshold issues.

First, Lumileds says that "per her own testimony, Bush did not assert a discrimination claim in connection with her layoff." (R. 93, PageID.3248–3249.) In particular, Lumileds refers to this testimony:

> Q. Why do you believe [Stolzenfeld] made the decision [to terminate your employment]?
> [Bush:] It was in retaliation for the EEOC complaint.
> Q. So you believe your termination was retaliatory?
> A. Yes, it was.
> Q. Do you believe it was discriminatory?
> A. Yes, I do.
> *Q. Why do you believe it was discriminatory?*
> *A. Due to the filing of the EEOC complaint.*

(R. 69-2, PageID.1274 (emphasis added).)

While it was certainly reasonable for Lumileds to have relied on this testimony in drafting its summary-judgment motion, given the circumstances of this case, the Court believes that Bush is pursuing a claim that her termination was motivated in part by her race.

As an initial matter, it is rather clear that before her deposition, Bush was pursuing a claim of discriminatory discharge. She pled that "Defendants terminated Plaintiff[']s employment because of race and retaliation." (R. 30, PageID.400.) Bush further alleged that she "had seniority over two other Sales Administrators" who were not terminated in connection with Lumileds' reduction in force and that both of their salaries were higher than hers. (R. 30, PageID.400.) Bush named Marion and Wougamon as the two "other" administrators and pled that they were both Caucasian. (R. 30, PageID.374, 378.) Given that complaints drafted by non-lawyers are to be construed liberally, *Bormuth v. County of Jackson*, 870 F.3d 494, 536 (6th Cir. 2017), the Court finds—as did the Magistrate Judge (R. 89, PageID.3044)—that Bush's complaint asserted that her termination was motivated in part by race.

So the question is not whether Bush brought a claim of discriminatory termination but whether Bush abandoned that claim during discovery. A plaintiff probably can abandon a claim during her deposition. *See Cooks v. Potter*, 109 F. App'x 810, 812 (7th Cir. 2004); *but see McGuire v. Bourbon Cmty. Hosp.*, No. 04-480-KSF, 2006 WL 208826, at *3 (E.D. Ky. Jan. 25, 2006) ("The defendant has provided no legal support for its theory of 'abandonment by deposition' and the Court can find none."). But the facts of the cases that this Court has examined on abandonment-by-deposition differ from the facts of this case. *Cf. Potter*, 109 F. App'x at 812 (noting, in a case primarily about disability discrimination, that the plaintiff abandoned race and gender claims by testifying during her deposition that she was not reassigned based on race or gender but additionally addressing race and gender claims on the merits); *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1363 n.1 (3d Cir. 1993) (finding abandonment where attorney (not plaintiff) stated that damages were not being sought and then reconfirmed that position at oral argument); *Russell v. Degussa Engineered Carbons*, No. C-06-93, 2007 WL

433284, at *12 (S.D. Tex. Feb. 6, 2007) (finding intentional inflection of emotional distress claim failed where, in his complaint, the plaintiff asserted that he had been mocked for his disability, but, during his deposition, "denied that the other employees talked about any of his mental impairments"); *Hailes v. Compudyne Corp.*, No. 2:05-CV-54-SRW, 2007 WL 60923, at *1 (M.D. Ala. Jan. 8, 2007) (finding retaliation claim abandoned where, during his deposition, the plaintiff twice denied that filing a workers' compensation claim had "anything to do with" the retaliation). Here, Bush did not explicitly say that she was abandoning her claim that she was terminated in part because of her race. To the contrary, when asked if her termination was discriminatory, she answered yes. Nor did she explicitly say that the "only" thing unlawful about her termination was retaliation. And, again, Bush is not an attorney. True, an attorney did help defend her deposition; but this counsel appeared for limited purposes and did not draft the complaint; he thus may not have been familiar with all of Bush's many claims. Moreover, in her summary-judgment brief, Bush continues to contest that McKee-Hessel was also part of the reduction-in-force and asserts that she was the "only true individual" in the Farmington Hills office who lost her job in the RIF. (R. 79, PageID.2228, 2236.) Singling out suggests discrimination at least as much as it suggests retaliation. While close, the Court does not believe that Bush abandoned a claim that her termination was motivated in part by her race. *See Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 31 (D.D.C. 2007) ("[I]n cases where abandonment has occurred, courts have almost uniformly founded such a determination on (1) an explicit and unambiguous statement by the plaintiff that a particular claim was no longer being brought or (2) factual assertions made in discovery, usually during deposition testimony, that contradict or otherwise fatally undermine the factual predicate for one or more of the plaintiff's legal claims as articulated in the complaint.").

The second threshold issue is the one mentioned at the outset of the Court's analysis: whether Lumileds has shown that Bush failed to exhaust her claims of a discharge prohibited by Title VII.

In its summary-judgment briefing, Lumileds pointed out that Bush never amended her EEOC charges to include a claim about her termination and that the EEOC never requested documents relating to her termination. (R. 69, PageID.1125.)

And in her report, the Magistrate Judge explained that Bush pled that she "was advised [by the EEOC] to wait until March 31, 2016, to amend her charge to address her layoff, and that she contacted the EEOC in April 2016 to inquire about amending her charge; however, she never did so." (R. 89, PageID.3010 (citation omitted).)

It is true that Bush never amended her EEOC charges to include a claim based on her termination. (R. 69-2, PageID.1279–1280, 1282.) And it is true that the EEOC never requested documents relating to her termination and she was never interviewed by the EEOC after March 31, 2016 (her last official day at Lumileds). (R. 69-2, PageID.1282.)

Even so, the Court does not believe that Bush's failure to file a charge (or an amended charge) raising retaliatory or discriminatory termination warrants summary judgment in favor of Lumileds on those two Title VII claims.

In her final complaint, Bush stated, "On February 3, 2016, the EEOC requested a Position Statement Rebuttal Letter" and, in response, Bush "provided new information on . . . the WARN 60." (R. 30, PageID.379; *see also* R. 79-2, PageID.2481.) "WARN 60" is a reference to the notice that Lumileds issued Bush informing her that she would be terminated due to a reduction in force. And in a summary-judgment declaration, Bush avers that "[i]n February 2016, I mention[ed] the lay-off to the Detective Brown with the EEOC only to be advise[d] that because

I was still receiving a paycheck and benefits, that I had to wait until it was completed. On April 13, 201[6], I contacted the EEOC to follow-up on my case and to inquir[e] about adding the charge for the layoff. To which I was advise[d] that I would be receiving my right[] to sue notices *and that I could include this in my complaint in federal court*." (R. 79-2, PageID.2448 (emphasis added).) And in her deposition, Bush recalled a telephone conversation with the EEOC investigator: "She stated that I did not need to amend my [charge], that . . . I would be receiving my right to sue letter and it can be filed if I decided to file in federal court." (R. 69-2, PageID.1281.)

Viewing Bush's declaration and her testimony in the light most favorable to her, it is reasonable to infer that Bush put the EEOC on notice that she believed her termination was unlawful but the EEOC elected not to investigate Bush's termination and instead told Bush to proceed to federal court. And where an employee indicates to the EEOC that she believes her termination is unlawful, and the EEOC informs the employee that she need not file an amended or separate charge relating to her termination and may instead proceed to federal court, the employee should not be penalized for taking the EEOC at its word. *See Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 490 (2d Cir. 2018) ("Title VII exhaustion requirement is subject to equitable defenses." (internal quotation marks omitted)); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2006) (providing that a plaintiff would be entitled to an equitable exception to exhaustion where the plaintiff "(1) diligently pursued his claim; (2) was misinformed or misled by the administrative agency responsible for processing his charge; (3) relied in fact on the misinformation or misrepresentations of that agency, causing him to fail to exhaust his administrative remedies; and (4) was acting pro se at the time").

With the two threshold issues out of the way, the question becomes how to proceed. Lumileds, as it mostly admits, did not specifically brief Bush's claim of discriminatory discharge (because it thought that Bush was not pursuing one). (R. 93, PageID.3250.) Lumileds' failure to brief the issue is a good reason to not proceed further. On the other hand, forging ahead might be proper given that the Magistrate Judge analyzed the claim. In particular, she noted that McKee-Hessel, who is Caucasian, was also eliminated in the reduction in force, and further found that Lumileds' retention of "white employees . . . in positions for which Bush was qualified is insufficient evidence for her to meet the heightened standard for proving actionable discrimination." (R. 89, PageID.3045–3046.)

The Court elects the conservative route. The Court acknowledges that when a plaintiff is terminated due to a reduction in force, and the plaintiff is not replaced but her duties instead absorbed, she must do more than show that a similarly-situated employee outside the protected class was retained. *See Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (explaining how the fourth element of the *prima facie* case is modified in the reduction-in-force context). But here, Bush alleges that Marion, who held the same position, had less seniority. (R. 30, PageID.400.) And in one sense this is true: Bush worked at Lumileds through the third-party agency before Marion did. (R. 79-2, PageID.2439.) And Bush alleges (and there is some record support) that Marion made more money than she did (recall that Marion got a base-pay increase in 2014 and Bush did not). (*See* R. 69-30, PageID.1665; R. 70, PageID.1799; R. 69-23, PageID.1477–1478.) Thus, the summary-judgment briefing and exhibits—as they presently stand—provide some indication that Marion, instead of Bush, should have been chosen in the reduction in force: Bush had worked at the Farmington Hills office longer and Marion cost Lumileds more in terms of payroll. Yet Bush, who is African American,

was selected and Marion, who is Caucasian, was not. *Cf. Rachells*, 732 F.3d at 663 (explaining that the "additional" evidence required in the RIF context might be that the employer retained a similarly-situated, but less-qualified employee outside the protected class). The Court is well aware that Bush (and apparently not Marion) was on a performance improvement plan at the time of the reduction in force. But the Court knows nothing about what considerations were taken into account by the "upper management" that executed the reduction in force. It may be that cost—and not performance—was the main criteria. If so, then maybe an inference would arise that race played a part in the reduction in force.

Given the state of the record, and because Lumileds has not specifically addressed Bush's discriminatory-termination claim, the Court will not dismiss Bush's discriminatory discharge claim at this time.

## C.

With Bush's Title VII discrimination claims resolved, the Court turns to Bush's retaliation claims.

Title VII prohibits an employer from "discriminat[ing]" against an employee "because [s]he has opposed any practice" made unlawful by Title VII or because she has participated "in any manner" in a proceeding under Title VII. *See* 42 U.S.C. § 2000e-3(a). A claim of retaliation under Title VII differs from a claim of discrimination under that Act in at least two significant ways. In one respect, a retaliation claim is easier to prove in that the retaliatory act need not alter the terms and conditions of employment; that is, instead of the "adverse action" necessary for a discrimination claim, an employee need only show that the employer's act was "materially adverse." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 67–68 (2006). The materially-adverse standard is met when the employer's action "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted). But in another respect, a retaliation claim is harder to prove than a discrimination claim: the protected conduct must be "a but for cause" of the materially adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

These differences are reflected in the *McDonnell Douglas* framework for retaliation claims brought under Title VII. Specifically, to "establish a prima facie case of retaliation a plaintiff must establish that: (1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (internal quotation marks omitted). "[T]he final element requires proof of so-called 'but-for' causation," i.e., the retaliation would not have occurred absent the protected conduct. *See Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018); *MacEachern v. Quicken Loans, Inc.*, No. 17-1005, 2017 WL 5466656, at *5 (6th Cir. Oct. 17, 2017). Similar to a discrimination claim, if Bush establishes a *prima facie* case, the burden of production shifts to Lumileds to show a non-retaliatory reason for the action. *See Rogers*, 897 F.3d at 772. And if Lumileds completes that task, then Bush would have to show that a reasonable jury could find that Lumileds' reason was a pretext for retaliation. *See id.*

Now to Bush's claims.

### 1.

In Count III, Bush asserts that Lumileds retaliated against her by giving her a negative performance review in early 2014.

To better understand this claim of retaliation, still more backstory is necessary.

Recall that in November 2013, Lumileds hired Arends. Because Bush believed that Arends' hiring was discriminatory, she spoke with Alyssa Gorski in Lumileds' human-resources department in December 2013. (R. 69-2, PageID.1175, 1186; *see also* R. 69-6, PageID.1356.) Gorski advised Bush to speak with Stolzenfeld about her job duties. (R. 69-2, PageID.1181.)

Gorski's recommendation led to a lengthy conversation between Stolzenfeld and Bush that took place on December 19, 2013. (R. 79-2, PageID.2478.) Bush expressed that she wanted to do sales work. Stolzenfeld wanted Bush to do operations work. (R. 69-2, PageID.1182–1183; R. 79-2, PageID.2478.) Stolzenfeld asked Bush to specify her desired sales tasks, but when Bush would not specify those tasks, Stolzenfeld accused Bush of being "insubordinate." (*See* R. 69-2, PageID.1182–1183; R. 79-2, PageID.2442–2243; R. 79-2, PageID.2478.)

After her meeting with Stolzenfeld, Bush sent an email to Gorski: "I would like to move forward with an official complaint regarding my treatment and my position here at Philips [i.e., Lumileds]." (R. 69-6, PageID.1355.) Although it is unclear whether it was before or after the meeting with Stolzenfeld (more likely after), Bush told Gorski about a number of discriminatory practices. She told Gorski that Arends' hiring was "discriminatory" and that Arends was being paid more to do her old duties; that a job requiring a master's degree was filled by a Caucasian applicant without a master's degree yet an African American applicant was denied for not having a master's degree; that Stolzenfeld would provide Caucasian males with higher pay than Caucasian females, and, in turn, provide Caucasian females with higher pay than African American females. (R. 79-2, PageID.2444; *see also* R. 69-2, PageID.1176, 1187–1191.) Bush also testified that she told Gorski "[h]ow African American female employees were treated with duties an[d] pay in the operations" group. (R. 79-2, PageID.2444.)

Stolzenfeld also sent an email after his meeting with Bush: he contacted Samfilippo (the general manager) and copied Gorski and McKee-Hessel on the email. Stolzenfeld explained that he had directed Bush to ask the sales managers what work she could do for them. (R. 79-2, PageID.2478.) But, said Stolzenfeld, when Bush spoke to those managers she explained that she wanted to leave Lumileds but did not want to repay the tuition coverage. (*Id.*) Stolzenfeld's email continued by suggesting that Lumileds offer to let Bush resign without repayment of the tuition coverage. (*Id.*) He explained, "My reasoning for this is looking backwards over the last 6 months and some of the issues we have had with her and some of the poor morale that is created in the office. I do feel to encourage her to reengage into her position and we assign tasks and projects she is willing to do may be more difficult than we have time to manage. Her discussions with Rhonda [McKee-Hessel] and I have had much pushback." (*Id.*)

Sometime in late December 2013 or early January 2014, Gorski investigated Bush's complaint. She interviewed Bush, McKee-Hessel, and Stolzenfeld. (R. 69-7, PageID.1361.) Gorski's summary of Bush's complaint and her investigation lists many issues—not one is race discrimination. (R. 69-7, PageID.1361.)

By mid-January 2014, McKee-Hessel and Stolzenfeld (with the agreement of other managers) had settled on giving Bush a "needs improvement" rating for "how" she carried out her work. (*See* R. 79-1, PageID.2404; R. 69-26, PageID.1635; R. 69-33, PageID.1684.) As explained, that rating rendered Bush ineligible for a base-pay increase in March 2014.

With that additional background, the Court turns to Bush's claim that her negative rating in January 2014 was retaliation for her December 2013 complaint to Gorski.

As noted, to establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish, among other things, that "her exercise of such protected activity was known by the

defendant." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018); *see also Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) ("[A]n employer cannot retaliate when it is unaware of any complaints."); *Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto.*, 210 F.3d 750, 755 (7th Cir. 2000) (explaining that unless "the person who made the decision to terminate his employment was aware of the discrimination allegations at the time," there would be no "causal link between the termination and the complaint of discrimination"); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (finding no causal connection where employee complained of unfair pay but did not mention pregnancy and thus employer was unaware of protected conduct).

Here, as the Magistrate Judge stated (R. 89, PageID.3033), a reasonable jury could not find that those involved in giving Bush a negative rating in January 2014 knew, prior to assigning her rating, that Bush had complained of discriminatory practices. Stolzenfeld says that when he met with Bush about her issues, race did not come up. (R. 69-33, PageID.1685.) Bush's testimony is not to the contrary: "I spoke to Tom about . . . I want to say it was the job duties and my intentions to focus more on the sales department and my non-interest in the operations department." (R. 69-2, PageID.1180.) Neither Stolzenfeld nor McKee-Hessel ever spoke with Bush about her complaint. (R. 69-2, PageID.1205.) True, both Stolzenfeld and McKee-Hessel were interviewed by Gorski regarding Bush's complaint; so it is possible that Gorski told Stolzenfeld and McKee-Hessel that Bush had complained about race discrimination. But on this record it remains just that: a possibility. Stolzenfeld testified that "Gorski spoke with me about Bush's complaint, and said that Bush wanted a change in job duties." (R. 69-33, PageID.1685.) McKee-Hessel testified, "I was advised that [Bush] had filed a complaint against Tom; details, I wasn't given." (R. 69-23, PageID.1458.) And Gorski's summary—despite listing a host of

complaints and items that she investigated—does not reflect that she spoke with Stolzenfeld or McKee-Hessel about race discrimination. (R. 69-7, PageID.1361.) Gorski wrote, "The findings of the investigation found no violation of company policy or General Business Principles, rather just a disagreement with management's decisions, and possible miscommunications, that have led to a degree of mistrust between manager and employee. . . . This matter was reviewed with Counsel and actions taken were deemed appropriate. Complainant was advised that there is no retaliation policy and to inform Ms. Gorski of any issues that may arise going forward." (R. 69-7, PageID.1361.) And while Bush's 2013 rating was finalized in a (January 2014) calibration meeting involving managers other than Stolzenfeld and McKee-Hessel (R. 69-26, PageID.1635; R. 69-25, PageID.1561–1562), Bush has not shown that any of those other managers knew that her December 2013 complaint was about race.

In short then, accepting that Bush did complain of race discrimination to Gorski in December 2013, this Court's *de novo* review reveals no evidence that Stolzenfeld, McKee-Hessel, or anyone else who had material input into Bush's rating knew that Bush had made that complaint. So, just as the Magistrate Judge found (R. 89, PageID.3033), Bush has not established a *prima facie* case of retaliation under Title VII.

### 2.

Count VI involves a number of alleged retaliatory acts that occurred in the second half of 2015.

For one, Bush asserts that Lumileds unlawfully retaliated by rescinding her tuition reimbursement. On August 10, 2015, Lumileds approved Bush for a tuition reimbursement. Then, on August 18, Bush wrote a "rebuttal" challenging her July performance review. (R. 69-14, PageID.1389–1393.) Then, on September 1, 2015, Lumileds rescinded Bush's tuition

reimbursement. (R. 69-13, PageID.1386.) Bush surmises that the reimbursement was rescinded because she challenged her review.

Having examined Bush's rebuttal for itself (R. 69-14, PageID.1389–1393), the Court completely agrees with the Magistrate Judge: "[Bush's] rebuttal did not include any allegations of discrimination," (R. 89, PageID.3041). As Bush's rebuttal was not protected by Title VII, the loss of her tuition reimbursement, even if retaliatory, did not violate Title VII. *See Rogers*, 897 F.3d at 775 (providing that a *prima facie* case requires that the plaintiff "engage[] in a protected activity").

Bush claims that the hiring of Wougamon in October 2015 was unlawful retaliation. (*See* R. 30, PageID.394–395; R. 94, PageID.3362.) Although unclear, it appears that the alleged protected activity preceding Wougamon's hire was either Bush's rebuttal or her September 8, 2015 EEOC charge. (*See id.*)

Either way, this Title VII claim should not proceed to a jury. As just stated, the rebuttal was not conduct shielded by Title VII. True, the September 8 charge was protected activity. (*See* R. 69-18, PageID.1411.) But notably, Bush says that the position that Wougamon ultimately filled was posted on September 3, 2015, i.e., before Bush filed the charge. And because only those with a bachelor's degree could apply for the job, Bush lacked the qualifications to apply. In other words, the alleged retaliatory act was well underway before the protected conduct. And on this record, a jury could not find that Lumileds would have taken down the posting and halted the process of hiring a new Sales Administrator had Bush not filed the September 8 charge. *See Nassar*, 570 U.S. at 360.

Bush also seems to assert that the reassignment of her sales- or marketing-related duties to Wougamon was retaliation. (R. 94, PageID.3362.)

Although the reassignment must have occurred after Bush's September 2015 EEOC charge (Wougamon was not hired until October 2015), no reasonable jury could find that the reassignment of job duties would not have occurred had Bush not filed that charge. According to Bush, the job posting listed her "exact" sales duties (R. 69-2, PageID.1284, 1292)—so Lumileds had planned for Wougamon (or whoever was eventually hired) to take the duties even before Bush filed her EEOC charge. Moreover, the record is also unclear when McKee-Hessel or Stolzenfeld learned of Bush's September 8, 2015 charge. It may well have been that Bush's sales duties had been reassigned to Wougamon before either of them learned of the September 8 charge. On this record, no reasonable jury could find that absent the September charge, Lumileds would not have transferred Bush's sales and marketing duties to Wougamon. *See Nassar*, 570 U.S. at 360.

Bush also claims that placing her on a performance improvement plan was retaliation.

Timing again does not favor Bush. Although the PIP was not administered to Bush until October 26, 2015, which was after Bush's September 2015 EEOC charge, McKee-Hessel had drafted a similar PIP in mid-to-late August 2015. Indeed, on August 21, 2015, McKee-Hessel asked human resources to review the draft PIP noting, "I would appreciate your feedback and edits so we can get it finalized next week." (R. 69-32, PageID.1674.) McKee-Hessel said that her "target" was to present the PIP the following Friday, and consistent with that, the draft PIP was dated August 28, 2015 (the following Friday). (R. 69-32, PageID.1674, 1676.) And Bush has not objected to the Magistrate Judge's finding that the October 2015 PIP and the August 2015 PIP only differed in "non-substantive" respects. (*See* R. 89, PageID.3040; R. 94, PageID.3361.) Given McKee-Hessel's clear intent to place Bush on the PIP as of August 2015, which was before Bush even filed her September 8, 2015 EEOC charge, a reasonable jury could not

conclude that McKee-Hessel would not have issued the PIP had Bush not filed her charge. *See Nassar*, 570 U.S. at 360.

In short, Lumileds is entitled to summary judgement on Bush's Title VII claims of retaliation in Count VI.

### 3.

Bush's last claim of unlawful retaliation, partly set out in Count VI and partly set out in Count VII, is that she was terminated for engaging in protected conduct. As noted, on January 29, 2016, Bush received a WARN Act notice informing her that she would be terminated pursuant to a reduction in force. Before that notice, Bush arguably engaged in the following protected conduct: filing EEOC charges (or amended charges) in September, November, and December 2015. Bush believes that she was selected for the reduction in force because she had engaged in those acts protected by Title VII.

True, temporal proximity and the fact that Marion was not terminated favor Bush's claim of retaliatory discharge.

But the claim has a fatal flaw: no evidence has been presented that anyone involved in selecting employees to be eliminated in the reduction in force knew that Bush filed charges with the EEOC. The record reflects that "upper management outside of Farmington Hills made the decision to eliminate Bush's position" and that neither Stolzenfeld nor McKee-Hessel were involved in the decision. (R. 69-33, PageID.1688; R. 69-26, PageID.1638.) And Bush has pointed to nothing indicating that any of the unidentified "upper management" knew of her EEOC charges. *See Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003); *Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto.*, 210 F.3d 750, 755 (7th Cir. 2000).

So Lumileds is entitled to summary judgment on Bush's Title VII claim that she was terminated because of her EEOC charges.

### D.

So far, the Court has focused on Title VII and has not mentioned Bush's parallel claims under Michigan's Elliott-Larsen Civil Rights Act. The Court notes that there may be differences in the legal standards governing claims under Title VII and ELCRA.

But if there are differences, neither party has identified any let alone argued that any differences would alter the outcome. To the contrary, in its summary-judgment reply brief, Lumileds stated, "ELCRA claims are analyzed under the same standards as Title VII claims." (R. 82, PageID.2525.) In her report, the Magistrate Judge cited Title VII standards and, other than exhaustion, did not flag any substantive differences between Title VII and ELCRA. And in her objections, Bush does not argue that her Title VII and ELCRA claims require separate treatment. In fact, although she cited some decisions by Michigan courts in her summary-judgment brief, Bush's objections cite only decisions by federal courts. (*See* R. 94.)

Accordingly, in this particular case, the Court sees no reason to separately analyze claims under Title VII and ELCRA. For the reasons given, Lumileds is entitled to summary judgment on all of Bush's claims under ELCRA save for Bush's claim of discriminatory discharge.

### E.

Remaining are Lumileds' three objections.

Lumileds objects to the Magistrate Judge's statement that it did not "specifically address the allegations" of Count IV. (R. 93, PageID.3247.) Lumileds points out that Count IV asserted "a multitude" of discriminatory acts and that while it did not discuss "each and every allegation

in detail," it "expressly addressed [the] allegations in footnote 9" of its summary-judgment brief. (R. 93, PageID.3247.)

The Court appreciates why the Magistrate Judge stated that Lumileds' did not specifically address the allegations in Count IV. But she (and this Court) have found that Lumileds' attack on Count IV was sufficient to win summary judgment on that count. So the objection is overruled as moot.

Lumileds next objects to the Magistrate Judge's determination that Bush asserted a claim of discriminatory discharge. (R. 93, PageID.3248.) Lumileds points to Bush's deposition statement that she thought her discharge was discriminatory because of "the filing of the EEOC complaint." (R. 93, PageID.3249.)

The Court will overrule this objection. As explained at length, the Court agrees with the Magistrate Judge that Bush intended to pursue a claim of discriminatory discharge in this case.

Lastly, Lumileds objects to the Magistrate Judge's statement that it did not address whether Bush could establish a *prima facie* case of "discrimination and *retaliation* for her layoff." (R. 93, PageID.3250 (emphasis added).) Lumileds quotes portions of its summary-judgment briefs indicating that it did argue that Bush could not establish a *prima facie* case for her retaliatory discharge claim. (R. 93, PageID.3251.)

The Court sustains this objection while noting that it seems to make little (if any) substantive difference. Lumileds did set out the law for a *prima facie* case of retaliation under Title VII and did argue that Bush could not show causation. (R. 69, PageID.1136.) The Court notes, however, that the Magistrate Judge found that Lumileds was entitled to summary judgment on Bush's claim of retaliatory discharge.

**IV.**

For the reasons stated, the Court ADOPTS the Magistrate Judge's thorough and well-reasoned report insofar as it is consistent with this opinion and ACCEPTS her recommendation save for her recommendation to grant Lumileds summary judgment on Bush's discriminatory discharge claims under Title VII and ELCRA. It follows that Lumileds' motion for summary judgment is granted in part. Lumileds is entitled to summary judgment on all of Bush's claims save for her Title VII and ELCRA claims of discriminatory discharge.

SO ORDERED.

Date:   September 26, 2018                         s/Laurie J. Michelson
                                                   Hon. Laurie J. Michelson
                                                   DISTRICT COURT JUDGE